**LEWIS INVISIBLE STITCH MACH. CO.**
**v. COLUMBIA BLINDSTITCH MACH.**
**MFG. CORPORATON.**

No. 219.

Circuit Court of Appeals, Second Circuit.
Jan. 6, 1936.

Henry L. Burkitt, of New York City, for appellant.

Victor D. Borst, of New York City (George T. Gill, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff filed the usual bill in equity against the defendant for infringement of a patent. The defendant answered making certain denials, setting up some prior references and uses, and concluding with a defence and counterclaim. The defence is based upon the notion that the plaintiff has disqualified itself from suing in equity because of its unjust conduct in regard to the patent in suit; the counterclaim incorporated the defence in toto and asked for damages and an injunction. Thus the counterclaim is in effect only the defence in a new dress, and to it we may therefore confine our consideration. It consists of seventeen articles, 47 to 64 inclusive, in general designed to allege that the plaintiff had been engaged in a course of conduct, partly alone, partly in concert with others, all directed to monopolize the "blind stitch sewing machine" industry, by driving out competitors through falsehood and threats. The first three articles, 47, 48 and 49, are by way of inducement and allege that the defendant's market is composed in large part of small dealers who are fearful of any patent litigation, and at once without contest will return to the manufacturer any machine challenged by a patentee; and that the plaintiff, practicing upon this sensitiveness of the trade, has tried by unfair means to frighten the defendant's customers. Articles 50 to 53 inclusive, allege that the plaintiff continuously represented to the defendant's customers that its machines

infringed the plaintiff's patents, and threatened "without justification" to sue them, with the purpose of intimidating all competitors, especially the defendant, and "stifling lawful and fair competition." That the plaintiff did this with full knowledge that its supposed inventions had all been in public use long before they were applied for; in spite of this it continued to misrepresent the facts. That in conjunction with one Mueller, the patentee of the patent in suit, the plaintiff for years watched developments ·in the trade, and filed applications for patents covering every new step as it appeared. The purpose in procuring such patents was to further this course of intimidation because the plaintiff knew that during the ensuing litigation with the defendant, its business would be ruined. Finally, though the patent in suit was procured nearly five years ago, and though the plaintiff had continuously used it to intimidate the trade, it had never sued anyone until it brought the suit at bar.

The remaining articles of the defence, 54 to 64 inclusive, lay a conspiracy. They allege that the plaintiff and two other persons named Buono (who did business as a company), conspired to destroy the defendant's business and others' by the threats of suits for infringement and by bringing such suits against users of "blindstitch" machines. The conspirators knew that the patents on which they relied covered machines previously in use, which had not been invented by the patentees. Merely to monopolize the trade and destroy the defendant, they made a crosslicensing agreement, and falsely broadcast that the trade was infringing their void patents, until, finding these threats ineffectual, they began to attack the defendant and other competitors by means of indiscriminate suits, which they knew to be groundless. The defendant's customers because of these practices refused any longer to deal with it, and cancelled their orders; because of all the conspirators' acts set forth in articles 47 to 63 inclusive, the defendant has been injured.

This was the defence; the counterclaim was in a single article which alleged that as set forth in the defence, "the plaintiff either individually or in association with its conspirators, has undertaken * * * to destroy defendant * * * and to suppress lawful competition * * * by misrepresentation, threats, intimidation and coërcion of the trade by the unlawful use * * * of letters patent * * * and that the defendant has been greatly and irreparably damaged and injured thereby to the extent of at least Five Hundred Thousand Dollars." The answer concludes with a prayer that the bill be dismissed and that the defendant recover its damages; it also prays that the plaintiff be enjoined from spreading false rumours about the defendant's business, from inducing its customers not to deal with it by threats and the like, and from suing customers or distributors with that end in view.

The plaintiff moved to strike out the whole defence; and from the counterclaim, articles 54 to 64 inclusive, and parts of article 65 not recognizable in the printed record because defined by the typed page; also articles 47, 48 and 49, and all references in articles 50, 53 and 65, so far as they affected others than the defendant. The judge erroneously assumed that the conspiracy in the counterclaim was brought under the Anti-Trust Acts; and thought the allegations of unfair competition merely conclusions. He granted the motion in full; that is, he struck out the whole defence and from the counterclaim all but articles 50, 51, 52 and 53, from which he struck out "those portions * * * which relate to acts committed by the plaintiff and affecting others than the defendant." The defendant appealed.

So far as the decree struck out the defence there can be no debate that it is not appealable; the suit remains undisposed of. Emlenton Refining Co. v. Chambers, 14 F.(2d) 104 (C.C.A.3); Cox v. Graves, Knight & Graves, 55 F.(2d) 217 (C.C.A.4); United States v. Continental Casualty Co., 69 F.(2d) 107 (C.C.A.2). The opposite is true if it struck out a whole counterclaim. General Electric Co. v. Marvel Rare Metals Co., 287 U.S. 430, 53 S.Ct. 202, 77 L.Ed. 408, but since it left standing articles 50 to 53 inclusive, the only theory which will support our jurisdiction is that the stricken articles set up a separate cause of suit, though that was not pleaded as such. This the defendant does not assert; on the contrary it insists that the conspiracy is only in aggravation of the preceding cause of suit for unfair trade practices.

Since there was not a syllable about interstate commerce, no conspiracy under

the Anti-Trust Acts was laid; and we need not consider whether a good cause of suit for conspiracy under the monopoly statutes of New York was alleged, because no one has suggested anything of the sort. So far as the counterclaim pleads conspiracy at common-law it was not a cause of suit independent of the tortious conduct involved in its execution. Whatever may be the rule in criminal conspiracies, it is well settled that the civil liability does not depend upon the confederation (which need be alleged only by way of inducement), but upon the acts committed in realization of the common purpose. Adler v. Fenton, 24 How. 407, 410, 16 L.Ed. 696; Howland v. Corn, 232 F. 35, 40 (C.C.A.2); Barry v. Legler, 39 F.(2d) 297, 302 (C.C.A.8); United States v. Pan-American Petroleum Co. (C.C.A.) 55 F.(2d) 753, 778; Cherry v. Howell, 66 F.(2d) 713, 715 (C.C.A.2); Perry v. Hayes, 215 Mass. 296, 297, 102 N.E. 318; Green v. Davies, 182 N.Y. 499, 503, 504, 75 N.E. 536, 3 Ann.Cas. 310. Of course, so far as the challenged conduct would be innocent unless part of a concerted action, this rule would have to yield; but this is not such a case. The same conduct was pleaded as a tort, whether the plaintiff was guilty of it singly or in concert with the Buonos. Hence there was no separate cause of suit in conspiracy, and the counterclaim was single.

Appeal dismissed.